AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>ANA LISSA REYES,<br>a/k/a, "Lizzette Reyes" | **4-12-70810 MAG**<br>Case No.<br>OAKLAND VENUE<br>**FILED**<br>JUL 19 2012<br>RICHARD W. WIEKING<br>CLERK, U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>OAKLAND |

_____
_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 20, 2011_____ in the county of _____Alameda_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1341 | Mail Fraud |

Penalties:

| | |
|---|---|
| Imprisonment: | 20 years maximum |
| Fine: | $250,000 maximum |
| Supervised Release: | 3 years maximum |
| Special Assessment: | $100 |

This criminal complaint is based on these facts:

Please see attachment.

☑ Continued on the attached sheet.

APPROVED AS TO FORM:

_____
AUSA WADE M. RHYNE

_____
_Complainant's signature_

**Nitiana Doss, FBI Special Agent**
_Printed name and title_

Sworn to before me and signed in my presence.

Date: ___7/19/12___

_____
_Judge's signature_

City and state: _____Oakland, California_____

**Kandis Westmore, United States Magistrate Judge**
_Printed name and title_

Document No.

District Court
Criminal Case Processing

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Nitiana Doss, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

## I. INTRODUCTION

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since August 2005. Currently, I am assigned to the White Collar Squad, Concord Resident Agency, San Francisco Field Office, where my responsibilities include investigation of fraud, embezzlement, investment schemes, and other financial-related crimes. As a federal agent, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

## II. PURPOSE OF THIS AFFIDAVIT

2.     This affidavit is being submitted in support of a criminal complaint and arrest warrant charging Ana Lissa Reyes, a/k/a, "Lizzette Reyes," among other aliases ("REYES") with Mail Fraud in violation 18 U.S.C. § 1341.

3.     As noted previously, this case is a joint investigation with the FBI and the Internal Revenue Service ("IRS") Criminal Investigative Division. The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, my training and experience, reports made to me by other law enforcement agents, physical surveillance observations, review of relevant business and public records, and interviews with witnesses, among other sources of information. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that, on or about July 20, 2011, REYES committed mail fraud by knowingly engaging in a fraud scheme to obtain money by means of false material representations, by acting with the intent to defraud, and by using the mails and/or by causing the use of the mails to carry out an essential part of her scheme, in violation of 18 U.S.C. § 1341.

III.   **SUMMARY OF PROBABLE CAUSE FOR MAIL FRAUD**

4.      In summary, as more fully set forth below, on or about July 20, 2011, as part of a continuing fraud scheme, REYES mailed a fraudulent letter to fraud victim Marc C. Tavernier ("Tavernier") in which REYES requested that Tavernier sign an enclosed insurance claims release and mail the claim release back to REYES in a self-addressed stamped envelope. REYES wrote the fraudulent letter on the letterhead of Law Offices of Brian Y.K. Ching, a small bay area law firm ("the law firm"), thereby falsely purporting herself to be a current employee of the law firm, falsely purporting that the law firm's address was at 675 Hegenberger Road, Suite 239 in Oakland, California ("the SUBJECT OFFICE"), and falsely purporting herself to be working on Tavernier's personal injury case. In fact, however, as part of a scheme to defraud and without authorization, REYES was holding herself out as a law firm employee with authorization to settle Tavernier's, and other clients', personal injury cases with insurance companies. After obtaining signed insurance claims releases from clients by mail, including Tavernier's signed claims release, REYES would send the claims releases to insurance companies by mail, would receive settlement checks from insurance companies by mail, and would then steal the funds for her own use and benefit. REYES' use of the fraudulent address at the SUBJECT OFFICE allowed her to continue and conceal her fraud from the law firm, and also from the insurance companies and the client victims, each of whom believed they were corresponding with an agent of the law firm who was acting within the scope of her duties.

IV.   **INCORPORATION OF PRIOR SEARCH WARRANT AFFIDAVIT**

5.      The current affidavit in support of the criminal complaint and arrest warrant is related to my prior affidavit in support of an application for search warrants in <u>Case Nos. 4-12-70746 KAW and 4-12-70747 KAW</u>. Specifically, on or about June 28, 2012, I submitted a single affidavit in support of an application for two search warrants in the above-referenced cases. For purposes of judicial efficiency, that affidavit is attached hereto and fully incorporated reference as <u>Exhibit 1</u>. On June 28, 2012, the Hon. Kandis Westmore, United States Magistrate Judge, timely reviewed and signed search and seizure warrants for the following two subject premises:

a.     675 Hegenberger Road, Suite 239, Oakland, California 94621 ("the SUBJECT OFFICE"); and

b.     Public Storage Unit Number A045, located at the Public Storage facility at 15951 Hesperian Boulevard, San Lorenzo, California 94580 ("the SUBJECT STORAGE UNIT").

6.     On June 29, 2012, during the execution of the search warrants at the SUBJECT OFFICE and the SUBJECT STORAGE UNIT, law enforcement found additional evidence confirming that REYES while employed as an office manager of a small bay area law firm, the Law Offices of Brian Ching ("the law firm"), engaged in a scheme to defraud and embezzled approximately $150,000 or more from the law firm and its clients, and then continued to defraud clients after she was fired by purporting to act as an employee of the law firm.  Law enforcement also found evidence of additional crimes committed by REYES, including mortgage fraud.

## IV.    PROBABLE CAUSE FOR MAIL FRAUD.

6.     During the execution of the search warrant at the SUBJECT STORAGE UNIT, law enforcement found, among other evidence of fraud, a purported law firm client file for a known client victim, Tavernier.

7.     In the SUBJECT STORAGE UNIT, agents recovered a copy of a letter on Ching law firm letterhead dated July 20, 2011, signed by REYES, addressed to Tavernier, which stated the following:

> Enclosed please find, release of all claims sent by the insurance for Avoyan. Please sign as indicated and mail it back ASAP at the self-addressed-stamped envelope I provided. If you have any question, please do not hesitate to contact our office.
>
> Very truly yours, Lizzette C. Reyes/Law Offices of Brian Ching

According to Tavernier, he received the aforementioned letter and self-addressed envelope from REYES in the mail.  Tavernier told me he signed the release, and mailed the packet back to REYES.  Consistent with Tavernier's representation, agents also found a copy of a signed release of claims form with Tavernier's signature on it.  As further evidence of fraud, as of on July 20, 2011, REYES was no longer employed by the Law Offices of Brian Ching.

8.     In the same Tavernier file, agents also recovered a fax cover sheet and attachment also dated July 20, 2011.  This fax was sent by REYES to 21st Century Insurance at (714 ) 672-1464.  The attachment to the fax cover sheet signed by REYES included a W-9 form (Taxpayer Identification number).  The W-9 form was signed by Brian Ching.  I previously discussed this W-9 form with Brian Ching.  Brian Ching told me that the signature on the W-9 form was not his, that REYES was no longer employed by his law firm on July 20, 2011, and that Tavernier was never a client of the law firm.  Accordingly, based upon my training experience, I believe that this confirms that REYES was engaging fraudulent mail communications with clients and with insurance companies to further her scheme to defraud.

9.     In the same Tavernier file, agents also recovered a LCR letterhead memorandum dated August 25, 2011, addressed to the Fresno Credit Bureau, in which REYES stated that Tavernier was being legally represented by LCR Legal Services and that the "Law Offices of Brian Ching is no longer the attorney of records."  I have researched LCR Legal Services within the California Department of Corporations with negative results.  I have researched the California State Bar Association database for REYES license to practice law with negative results.

## V.     CONCLUSION

10.    For the reasons stated above, I believe there is probable cause to believe that, on or about July 20, 2011, REYES committed mail fraud by knowingly engaging in a fraud scheme to obtain money by means of false material representations, by acting with the intent to defraud, and by using the mails and/or by causing the use of the mails to carry out an essential part of her scheme, in violation of 18 U.S.C. § 1341.  Accordingly I respectfully request that the Court issue the requested criminal complaint and arrest warrant.

///

///

///

///

///

///

4

## VI. REQUEST TO SEAL

11.     Because this investigation is continuing, disclosure of the complaint, arrest warrant, and this affidavit could jeopardize the progress of the investigation and the execution of the arrest warrant.  Accordingly, I request that the Court issue an order that the complaint, arrest warrant, and this affidavit be filed under seal until further order of this Court.


_____

NITIANA DOSS
Special Agent, Federal Bureau of Investigation


Sworn to before me this

19th day of July 2012.


_____

HONORABLE KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

**A F F I D A V I T**

I, Nitiana Doss, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

## I.    INTRODUCTION

### A.    Professional Background.

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since August 2005. Currently, I am assigned to the White Collar Squad, Concord Resident Agency, San Francisco Field Office, where my responsibilities include investigation of fraud, embezzlement, investment schemes, and other financial-related crimes. As a federal agent, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

### B.    Investigation Background.

2.    This case is a joint investigation with the FBI and the Internal Revenue Service ("IRS") Criminal Investigative Division. The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, my training and experience, reports made to me by other law enforcement agents, physical surveillance observations, review of relevant business and public records, and interviews with witnesses, among other sources of information. Because this affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1028A (Aggravated Identity Theft), among others, will be found at the two subject premises described below.

3.    The facts of the investigation indicate that Ana Lissa Reyes, a/k/a, "Lizzette Reyes," among other aliases ("REYES"), while employed as an office manager of a small bay area law firm, the Law Offices of Brian Ching, embezzled more than $150,000 from the law firm

1   and its clients, and then continued to defraud clients after she was fired by purporting to act as an

2   employee of the law firm. For example, REYES engaged in the following fraudulent activities,

3   among others, both while employed by the law firm and after her employment was terminated:

4   (1) she resolved claims without clients' or the law firm's knowledge or permission and then stole

5   the settlement proceeds and deposited them into her personal bank accounts; (2) she engaged

6   clients without the knowledge or permission of the law firm and stole the clients' retainer and/or

7   fee payments; (3) she stole client funds directly from the law firm's client trust account and

8   deposited them into her personal bank account; (3) she obtained filing fee waivers for certain

9   clients and then fraudulently billed those same clients for filing fees; and (5) she created a fake

10  company to continue to carry out her scheme to defraud as a means to correspond with the law

11  firm's clients through various mailings and electronic communications in an effort to make it

12  appear as if the clients' cases were still ongoing thereby continuing to collect retainer and/or fee

13  payments. In doing so, REYES mailed documents with forged signatures of clients and the law

14  firm's attorney on checks, letters, and other documents. REYES also used email to correspond

15  with clients and the law firm's attorney in furtherance of her scheme to defraud. Additionally,

16  since her termination from the law firm, REYES took and retained evidence, fruits, and

17  instrumentalities of her crimes, including, documents, records, files and correspondence, which

18  REYES has admitted to currently storing at her office in Oakland, California ("the SUBJECT

19  OFFICE") and at her public storage unit in San Lorenzo, California ("the SUBJECT STORAGE

20  UNIT").

21  **II.     PURPOSE OF AFFIDAVIT**

22          A.      **Premises to be Searched.**

23          4.      As set forth more fully below, I believe there is probable cause to believe that

24  evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C.

25  § 1341 (Mail Fraud); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1028A

26  (Aggravated Identity Theft), among others, will be found at the following two locations

27  (collectively, "the SUBJECT PREMISES"):

28

a.      675 Hegenberger Road, Suite 239, Oakland, California 94621 ("the SUBJECT OFFICE"); and

b.      Public Storage Unit Number A045, located at the Public Storage facility at 15951 Hesperian Boulevard, San Lorenzo, California 94580 ("the SUBJECT STORAGE UNIT").

5.      The SUBJECT PREMISES are more fully described in Attachment A-1 and Attachment A-2, which are attached hereto and incorporated by reference. This search warrant primarily seeks the seizure of documentary evidence related to the criminal violations described above, and other such items that are more fully described in Attachment B, which is attached hereto and incorporated by reference. Additionally, in order to prevent the disclosure of potentially privileged materials, the review of seized evidence will be accomplished in accordance with the filter team review procedures set out in Attachment C, which is attached hereto and incorporated by reference.

III.   **PROBABLE CAUSE**

A.      **REYES' Employment at the Law Firm.**

6.      Brian Ching ("Ching") was the primary attorney and owner of Law Offices of Brian Ching, a small bay area law firm specializing in personal injury, family law, and criminal defense ("the law firm"). From approximately 1998 to approximately 2008, the law firm office was located at 512 Westline Drive, Suite 204, Alameda, California. In approximately 2008, Ching moved the law firm office to 32960 Alvarado Niles Road, Union City, California. In approximately 2007-2008, Ching opened a small office at 1412 Powell Street, Suite A, San Francisco, California, while still practicing at the Union City location. According to Ching, in approximately 2011, Ching handled clients primarily out of the San Francisco office. From approximately 1992 to approximately 2006, Gloria Custodio ("Custodio"), Ching's then wife, assisted Ching with his practice as the law firm office manager. Custodio's responsibilities included communicating with clients, client medical billing, relaying settlement communications, and other clerical duties. According to Custodio, in 1994, the law firm hired REYES (who is Custodio's cousin) to assist with basic law firm clerical duties.

**B.   REYES Steals From Client Trust Account.**

7.      According to Custodio, in approximately 1994, Custodio confronted REYES with an allegation that REYES took $10,000 from the client trust account. The stolen checks totaling $10,000 were addressed to a specific client. As a result of the theft, Custodio terminated REYES' employment at the law firm. However, approximately 30 days later, Custodio reached an agreement with REYES that if REYES attended a counseling program, REYES could return to the law firm and work extra hours to compensate for the losses REYES caused. REYES agreed and returned to work at the law firm.

**C.   REYES Assumes More Responsibility at the Law Firm.**

8.      Over time, REYES continued to work at the firm and began to assume more responsibility with less supervisory oversight, until her eventual termination in June 2011. By around 2006, Ching and Custodio began exercising less oversight over REYES and over the day-to-day management of the law firm, based, in part, on their son's health continuing to deteriorate until his death in 2011. In order to help care for their son, Custodio stopped working at the law firm. When Custodio left the law firm, she trained REYES to take over all office manager duties, including how to handle all of the law firm's mail, emails, and faxes along with handling insurance billing, relaying settlement communications, client handling, and court filings, among other duties. REYES was fluent in Tagalog and Spanish, and was able to well communicate with most clients fluently in their language.

9.      Beginning in 2006, there was also less financial oversight over REYES' financial activity at the law firm because Ching no longer had the funds to support the services of the firm's previously retained Certified Public Accountant.

**D.   Client Complaints Against the Law Firm.**

10.      In approximately 2009-2010, Ching learned that clients were complaining about not receiving their personal injury settlement checks, despite being notified by their insurance companies that these checks had been cashed. REYES answered many of these calls on behalf of the law firm. Ching asked REYES about the clients' complaints and REYES denied any wrongdoing. Custodio told me that she and Ching were not able to immediately investigate

4

1 the clients' claims at that time due to their son's worsening health. However, shortly thereafter,

2 the California Bar Association notified Ching of an official client complaint alleging that the

3 client did not receive settlement funds due to him/her. Then by approximately 2010, several

4 clients had come forward with complaints to the California State Bar and to local police

5 departments accusing Ching of misappropriation of clients' funds.

6      11.    In early 2011, the California State Bar opened a disciplinary investigation

7 supported by multiple client complaints accusing Ching of misappropriation of funds.

8      12.    In March 2011, as California State Bar's investigation was pending, REYES

9 opened an office at 675 Hegenberger Road, Suite 239, Oakland, California ("the SUBJECT

10 OFFICE"). REYES told Ching that she wanted to open her own legal services and that she

11 would continue to be Ching's office manager working out of the SUBJECT OFFICE at

12 Hegenberger. According to Ching, he used the SUBJECT OFFICE on a couple of occasions to

13 handle clients' cases. As explained below, the evidence shows that REYES named her legal

14 services company, "Lincoln Litigation."

15        **E.**    **REYES' Admits to Stealing from the Law Firm Again.**

16      13.    As the law firm began investigating the clients' claims, it confirmed that

17 REYES had engaged in fraudulent activities that caused initial losses to the law firm of over

18 $150,000. For that reason, Ching officially terminated REYES' employment and association

19 with the law firm in June 2011 and ordered REYES to return all law firm files. (Ching told me

20 that with the death of his son, he was not in a position to fully investigate and respond to

21 REYES' criminal activities any sooner.) Ching also informed REYES of the consequences he,

22 his family, and over 40 client victims suffered as a result of her actions. REYES told Ching that

23 she had "made some mistakes" and apologized for her actions. According to Custodio, REYES

24 sent six text messages to Ching at telephone number: 510-326-8283. The text messages were

25 sent from telephone number 510-332-9265, and read as follows:

26            "Is it ok to call you and talk to you?"

27            "Is it ok to call you and talk to you?"

28            "Now is possible?"

"I'm really really sorry about everything. I know that my words don't mean anything right now after everything, but I truly am. I wish that I can take everything back, and start all over, but I can't. I promise that I will try my hardest to pay everything back and can only hope that some day you will forgive me. I won't bother you, I just wanted to say that". 5. "I'm sorry more than I can ever say. I wish I could take away everything. I am sorry for causing you and your family pain. I am going to try hard and figure out how I'm going to pay you back. Even with that, I know it wouldn't be enough. I'm sorry, so very sorry. I wish my life is worth something because if it did, I could give it up to make things right. I'm sorry Brian, I really am. The whole family hates me and I don't blame them. I did this to myself, I don't know what else to say, but I'm sorry". 6. "I'm sorry that I let you down, you were nothing but good to us".

14. Based on my review of the records for telephone number 510-332-9265, I know that it is a cellular telephone number registered to Lizzette Reyes, with a billing address at 15934 Hesperian Boulevard, San Lorenzo, California.

15. Despite REYES' admissions and apology, the law firm continued to receive complaints that REYES was continuing to collect retainers and legal fees from the law firm's clients holding herself out as the law firm's Office Manager. According to Custodio, Custodio filed police reports against REYES with the Alameda County Sheriff's Office, the Alameda Police Department, and the Union City Police Department.

16. As Ching continued to investigate client complaints, he learned that it was typical for victim clients to call REYES on numerous occasions to complain about their case status and to ask about calls they had received from medical collection companies for unpaid medical bills, such as Healthcare Recoveries. As part of her scheme, REYES would often tell the victim client that she was working on the case, or, in some cases, that she was waiting for a new insurance adjuster. However, in most cases, at the time of these calls, the clients' insurance settlement checks had already been stolen and cashed by REYES. According, to Custodio, and based upon her investigation of REYES' scheme, Custodio believes that the list of people and entities identified in Attachment B constitute a non-exclusive list of those that were defrauded by REYES. Custodio also told me that during her review of the law firm's records, Custodio found court fee waiver forms that were filed by REYES for certain clients. Custodio also found copies of checks from those clients made payable to the law firm for court filing fees. Based upon this,

6

Custodio concluded that REYES had obtained fee waivers for certain clients and later billed those clients for fraudulent filing fees.

F. **California Bar Association Disposition.**

17. I have reviewed the California State Bar documents associated with Ching's case. California State Bar case number 11-O-13019 stated in summary that client Ogbu hired Ching as Obgu's attorney in July 2006 for representation on personal injury case. Obgu later learned that Ogbu's insurance company had settled Ogbu's case for $7,800. Ogbu was unaware of the settlement of the case, or the issuance of the check. As a result, Ogbu filed a complaint with the California State Bar. Upon investigation, the California State Bar found Ching responsible for misappropriation of funds as follows: "By failing to deposit Ogbu's $7,800 in funds in trust; by failing to maintain the funds in trust; by failing to promptly notify Ogbu of his receipt of the funds; and by failing to promptly pay out the funds, respondent willfully violated Rules of Professional Conduct, rule 4-100(A)& (B)(1)."

18. In 2012, Ching was ultimately disbarred from the California State Bar Association for misappropriation of clients' funds, despite the fact that REYES was the individual who committed the fraudulent acts.

G. **Client Victim Summaries.**

19. As part of my investigation, I have interviewed multiple former law firm clients who were victims of REYES' fraud. Some specific examples of REYES' acts of defrauding the law firm and its clients are set forth below.

1. **Client Victim Gene Galvez**

20. On June 6, 2012, former law firm client Gene Galvez ("Galvez") told me that he hired the Law Offices of Brian Ching in June 2005 to obtain legal representation for his divorce and child custody proceedings and paid an initial retainer of $1,500.00. Galvez met with Ching prior to court appearances, but primarily dealt with REYES, who Galvez believed was Ching's paralegal. Galvez recalled meetings with REYES sometime in 2005 and in 2007 during both of which REYES requested additional legal fee payments of $500.00 to $1,000.00, respectively, for a total of $3,000.00.

7

1      21.     As part of Galvez's divorce settlement, Galvez agreed to pay monthly spousal

2   support of $833.00 to his ex-wife, Jessie Galvez. REYES told Galvez that he should deliver the

3   checks directly to REYES. Accordingly, between approximately 2009 and September 2011

4   (including a time frame after REYES' termination), Galvez hand delivered to REYES a total of

5   25 spousal support checks in amounts of $833.00, made payable to Jesse Galvez. REYES

6   instructed Galvez to deliver all checks directly to REYES so that REYES could deliver them to

7   the ex-spouse. In June 2011, REYES requested Galvez to start hand-delivering the checks to the

8   law firm's new office located at 675 Hegenberger Road, Suite 239, Oakland, California (the

9   SUBJECT OFFICE). In turn, Galvez hand delivered the following checks directly to the

10  SUBJECT OFFICE:

11                 Check number 1110 for $500.00 dated June 15, 2011 (legal fees)
                   Check number 1105 for $833.00 dated June 30, 2011 (spousal support)
12                 Check number 1106 for $833.00 dated July 1, 2011 (spousal support)
                   Check number 1107 for $833.00 dated July 27, 2011 (spousal support)
13                 Check number 1109 for $833.00 dated July 29, 2011 (spousal support)
                   Check number 1112 for $500.00 dated September 21, 2011 (legal fees)
14

15      22.     Galvez stated that the SUBJECT OFFICE seemed professional. Galvez noted one

16  desk, a telephone, a fax machine, filing cabinets, plants, picture frames on the walls, papers on

17  the desk, and a laptop REYES that was working on.

18      23.     Galvez stated that REYES continued to communicate with Galvez until December

19  2011 representing herself as the "Legal Assistant" to Ching. REYES told Galvez that his court

20  date was coming soon, and he would have the opportunity to meet with Ching before his

21  up-coming court appearance. At the end of 2011, Galvez attempted to contact REYES on

22  numerous occasions without a response. Galvez then called the firm's prior number at the Union

23  City location and spoke with Custodio, who explained to Galvez that the law firm terminated

24  REYES in June 2011 for stealing funds from the firm's clients' accounts. Custodio also told

25  Galvez that the spousal support checks and legal fees that he had provided to REYES, probably

26  had not reached the intended payees. In turn, Galvez contacted his ex-wife Jessie Galvez, to

27  inquire whether she had received the 25 spousal support checks he had written to her. Jessie

28  Galvez stated that she only received four checks of the 25 checks that Galvez had given to

8

REYES. According to bank records the four checks cashed by Jessie Galvez were:

Check number 93 for $833.00 dated April 1, 2009
Check number 94 for $833.00 dated August 24, 2009
Check number 95 for $833.00 dated July 31, 2009
Check number 96 for $833.00 dated July 31, 2009

24. Galvez reviewed all checks with Jessie Galvez. Jesse Galvez stated that she had endorsed the back of the aforementioned checks for deposit into her account. The remaining 21 checks were not received by Jessie Galvez, and had two endorsement signatures that were not Jesse Galvez's signature. I have reviewed the 25 checks and determined that 21 of the 25 checks have two signatures on the endorsement line and no bank stamp of deposit; and four of the 25 checks have one single signature on the endorsement line and a bank deposit stamp. I also noticed that the signatures are inconsistent among both sets of checks. Additionally, according to Ching, Ching never received or endorsed Galvez's legal fee checks. Because Galvez's custody proceedings never took place, Galvez currently works full-time, and borrows money from his family members to pay for costs associated with his ongoing custody court proceedings.

### 2. Client Victim Flora Caneja

25. On June 7, 2012, former law firm client Flora Caneja (Caneja) told me that she hired the Law Offices of Brian Ching in late 2007 to handle a personal injury case. Caneja was referred to the law firm by Custodio, who she had met while shopping for home remodel material.

26. REYES assumed legal assistant duties on Caneja's case in 2008. Caneja and REYES exchanged written correspondence by mail, phone calls, and emails regarding Caneja's personal injury case.

27. Sometime in 2010, Caneja received a mailed letter from her insurance company advising Caneja that her case had been settled and they needed Caneja's signature for approval to issue the settlement check. Because Caneja had not authorized the law firm to settle her case, she immediately called REYES to inquire about the insurance company's letter. REYES advised Caneja that the letter was incorrect, that the case had not been settled, and that REYES was still working on the case. During the months after that call, Caneja was unsuccessful in multiple

9

1  attempts to reach REYES about the status of her case. When REYES finally returned Caneja's

2  telephone calls, REYES stated that REYES' father had passed away and that REYES had been

3  preoccupied with family business.

4      28.     Thereafter, in or about October 2011, Caneja received an email from REYES

5  advising Caneja that Reyes was searching for a new insurance adjuster. REYES told Canejo that

6  the law firm's address would be at the SUBJECT OFFICE at:

7              Law Office of Brian Ching
               675 Hegenberger Road, Suite 239
8              Oakland, California 94621
               Telephone number: 510-250-2195
9              Fax: 510-679-6233

10     29.     In late 2011, after receiving REYES' email, Caneja directly contacted Custodio to

11 inquire about the status of her case. Custodio explained to Caneja that the law firm had

12 terminated REYES in June 2011 for fraudulent activities. Custodio told Caneja, that according

13 to the law firm's records, Caneja's $7,300 settlement check had been previously deposited into

14 Ching's account in October 2009. (According to Ching, he did not sign or receive a settlement

15 check on behalf of Caneja's insurance.) Custodio added that according to the law firm's records,

16 Caneja did not have any other pending personal injury cases at the law firm. Caneja was

17 unaware of the existence of this settlement check.

18     30.     In late 2011, after concluding that REYES likely fraudulently cashed Caneja's

19 settlement check, Caneja contacted REYES and requested a meeting. REYES agreed to meet

20 and told Caneja to meet her at the SUBJECT OFFICE. Caneja took the BART train to Oakland

21 where REYES picked her up at the station driving a new model black Mercedes SUV and drove

22 her to the SUBJECT OFFICE. Once inside, Caneja observed a desk with pictures of REYES'

23 daughter, a fax machine, a telephone, a filing cabinet, and several documents on the desk.

24 Caneja confronted REYES about REYES' recent emails about the new adjuster for Caneja's

25 claim. Specifically, Caneja received an email from REYES on October 13, 2011. The email

26 stated that there was a new adjuster handling Caneja's case, and that the new adjuster's mailing

27 address was: "U.C. Adjusting Co. 2146 Meench Drive, Moore, Oklahoma 71370, telephone

28 number: 1800-228-5016, fax number: 1800-208-4705." I have reviewed the email and noted that

10

U.C. Adjusting Co.'s address is the same address as Lincoln Litigation's (which was the name of REYES' legal services business). The telephone numbers REYES provided for the new insurance adjuster are the same telephone numbers as those for Lincoln Litigation. I researched the Oklahoma Department of Corporations for U.C. Adjusting Co. with negative results. Caneja became suspicious of the out-of-state companies provided by REYES, and confronted REYES on the matter. Upon being confronted, REYES stated to Caneja that she needed to leave, and abruptly ended the conversation.

### 3. Client Victim Marc Tavernier

31. On June 6, 2012, former law firm client Marc Tavernier ("Tavernier") told me that he hired the Law Offices of Brian Ching in or about November 2010 to handle a personal injury case based on a referral from Tavernier's chiropractor. Tavernier stated that he communicated with the law firm by phone and fax only and that he never personally went to the law firm's offices. All communication with the law firm was with REYES, whom Tavernier believed to be the law firm's legal assistant. Tavernier has never spoken with Ching or Custodio.

32. In 2010, Tavernier called the law firm and spoke with REYES about his personal injury claim. REYES mailed the attorney-client agreement to Tavernier's residence. Tavernier completed the agreement, and mailed it back to REYES. Tavernier had little knowledge about the status of his case until approximately July 2011. Specifically, on July 29, 2011, Tavernier received mailing from REYES containing his settlement check of $3,664.81. The letter was signed by REYES, and it instructed Tavernier to endorse the check back to the law firm as soon as possible, so that REYES could pay the medical bills associated with Tavernier's personal injury case. The letter included a self-stamped envelope with instructions to mail the check to:

> Law Offices of Brian Y.K.Ching
> 675 Hegenberger Road, Suite 239
> Oakland, California 94621
> Tel: (510) 769-0200
> Fax: (510) 629-6233

33. In December 2011, Tavenier contacted REYES about his case status and REYES told him that it was almost settled and that she was working on it. However, in early 2012, Tavanier called Ching after learning of the fraud allegations against REYES. Ching told

11

1   Tavanier that Ching was unaware that Tavanier's case existed, was unaware that the law firm had

2   agreed to represent Tavanier, and was unaware that there had been a settlement check. As a

3   result, Tavanier filed a complaint with the California State Bar Association. Tavanier's medical

4   bills remain unpaid.

5   **H.   The SUBJECT OFFICE.**

6   34.   On March 7, 2012, I obtained from the property management company in charge

7   of all units located at 675 Hegenberger Road, Oakland, California a copy of the SUBJECT

8   OFFICE's lease agreement. According to the lease agreement, "Ana Lissa Reyes" signed to rent

9   suite number 239 on March 1, 2008 for a monthly fee of $252.00. In the agreement, REYES

10  represents herself as the owner of "LCR Legal Services." According to the management

11  company, REYES is currently late on rent payments and is subject to eviction at the end of June

12  2012.

13  35.   On June 6, 2012, I conducted physical surveillance of the SUBJECT OFFICE.

14  The SUBJECT OFFICE is a single unit inside a multi-unit commercial building. The call box

15  located near the front door of the building identifies "LCR Legal Services" as the tenant in suite

16  239. The front door of suite 239 has a posted sign that reads "ETC.."

17  36.   On June 8, 2012, I contacted Ian Clark ("Clark"), the on-site property manager,

18  who sated that REYES requested "ETC.." to be the signage of her door. On June 13, 2012, Clark

19  stated that as standard practice based on unpaid rent, he conducts an inventory of the property

20  inside the units. Clark informed me that he conducted an inventory of the unit on June 13, 2012.

21  In the SUBJECT OFFICE, Clark observed a filing cabinet containing files titled as follows:

22  "Family Law, Healthcare Recoveries (a medical collection company associated with at least one

23  victim), Retainer Fees, and Settlements".

24  **I.   The SUBJECT STORAGE UNIT.**

25  37.   On June 7, 2012, I interviewed Ching about the SUBJECT STORAGE UNIT,

26  among other things. Ching stated that when the law firm was moving from Alameda to Union

27  City in approximately 2008, he tasked REYES to find a new office location for the law firm and

28  assist in the move. As part of the law firm's move, REYES used the SUBJECT STORAGE

12

UNIT to store boxes, files, and furniture, among other things. Ching assisted REYES in moving items into the SUBJECT STORAGE UNIT, which was located near REYES' residence in San Lorenzo, California on Hesperian Boulevard. Ching went to the SUBJECT STORAGE UNIT on approximately two occasions. CHING did not have his own access to the SUBJECT STORAGE UNIT, but may have been given an entry gate code to access the unit by REYES at one time.

38. In June 2012, I contacted Public Storage, located at 15951 Hesperian Boulevard, San Lorenzo, California. The on-site property manager provided a copy REYES' lease agreement and gate access information to me. The lease agreement indicates that REYES agreed to rent unit A045 on November 10, 2008 under the name Ana L. Reyes. REYES is currently late on rental payments, and is subject to eviction in the end of June 2012.

39. As standard business practice, Public Storage conducts an inventory of delinquent tenants. On June 11, 2012, Public Storage conducted an inventory of the SUBJECT STORAGE UNIT and confirmed that it contained items including boxes, files, file cabinets, and furniture. The SUBJECT STORAGE UNIT is currently secured by the on-site manager pending payment of outstanding rental balance. Public Storage has made several attempts to contact REYES for payment. An analysis of the access code history indicates that between November 10, 2008 and May 3, 2012, REYES usually accessed the SUBJECT STORAGE UNIT on a monthly basis, and at times, several times per month.

40. Also according to Brooks, Ching has a history of alcohol abuse which Brooks believes impaired Ching's ability to timely detect and subsequently address REYES' fraud scheme. Brooks believes that Ching continues to abuse alcohol.

**J. REYES Confirms Evidence Inside the SUBJECT STORAGE UNIT.**

41. On June 8, 2012, I contacted attorney Keith Brooks ("Brooks"), who represents Ching in his case before the California State Bar Association. Brooks was in direct contact with REYES from approximately July 2011 until February 2012. In approximately the Spring of 2011, Brooks met with REYES at the SUBJECT OFFICE to discuss her scheme to defraud the law firm and its clients. After several meetings, REYES admitted to Brooks that she had in fact stolen from the firm's clients' accounts. In approximately November 2011, REYES provided

1 Brooks with an incomplete list of victims she admitted to defrauding, both during and after her

2 employment at the law firm.

3     42.     In February 2012, Brooks requested that REYES bring all of the law firm's files

4 in her possession to Brooks. REYES had previously told Brooks that REYES would need to

5 retrieve the responsive files from her "storage unit." A short time later, REYES provided Brooks

6 with some client files, that appeared to be for inactive cases. Brooks added that REYES only

7 brought the files that Brooks had specifically requested. REYES did not bring the files of other

8 known victims. Upon reviewing the files, Brooks told me that the files were inactive, and

9 possibly contained fraudulent information. Brooks also told me that he had obtained court

10 documents from REYES that REYES represented she had filed with the court, however when

11 Brooks went to check the case numbers on those cases, Brooks learned that REYES had not in

12 fact filed the documents as she had represented.

13     **K.**     **REYES' Bogus Company – Lincoln Litigation.**

14     43.     Upon reviewing documents provided by witnesses, I noticed several documents

15 from a business named Lincoln Litigation. Based on witnesses' statements that they attempted

16 on numerous occasions to contact Lincoln Litigation with negative results, I researched the

17 business and concluded that REYES created a company named Lincoln Litigation, located at

18 2146 Meench Drive, Moore, OK, 71370. Between 2010 and 2011, Lincoln Litigation letters

19 were sent to clients to make it appear as if their cases were still ongoing, when in fact, the cases

20 had been settled in years prior. Lincoln Litigation letters regularly provided a status update and

21 were signed by "Tonya Hatchel."

22     44.     In approximately April 2012, I contacted Tonya Hatchel ("Hatchel"). Hatchel

23 stated that she has known REYES for nine years but has never heard of Lincoln Litigation.

24 Hatchel confirmed her home address is 2146 Meech Drive, Moore, OK (the same address

25 provided on Lincoln Litigation letters). Hatchel stated that she does not often speak often with

26 REYES, and primarily exchange messages via Face Book. Hatchel stated that has never signed a

27 document on behalf of Lincoln Litigation, nor has she had a professional relationship with

28 REYES. Hatchel has not received documents or faxes on behalf of Lincoln Litigation. Hatchel

1     was not familiar with the telephone numbers provided on the Lincoln Litigation letters

2     (1-800-228-5016, fax: 1-800-208-4705).

3           45.      On June 5, 2012, I interviewed Dr. Lihn Nguyen (Nguyen), a chiropractor who

4     handled personal injuries cases with Ching for several years. On June 9, 2011, Dr. Nguyen's

5     office received a letter from REYES and Lincoln Litigation. The letter responded to a prior

6     notice that Dr. Nguyen had sent to the law firm demanding payment for chiropractic services Dr.

7     Nguyen rendered in a previously settled case. The Lincoln Litigation letter was signed by Tanya

8     Hatchel and stated that a settlement agreement of $9,200 had been reached in the case, but that

9     the law firm needed to confirm that the amount was acceptable to the law firm's client, Carmelo

10     Sanchez ("Sanchez").

11           46.      Dr. Nguyen told me that she attempted to contact Lincoln Litigation's 1-800

12     number set out in the letter on numerous occasions, and heard a voice mail greeting stating she

13     had reached Tanya Hatchel with Lincoln Litigation, and to leave a message. Dr. Nguyen never

14     received a return phone call.

15           47.      On June 5, 2012, I spoke with the above-referenced former law firm client and

16     chiropractic patient, Sanchez. Sanchez stated that in 2011, she learned from Dr. Nguyen that Dr.

17     Nguyen did not get paid for her services by the law firm. In turn, Sanchez contacted her

18     insurance company, AAA, to inquire of the status of the case. AAA informed Sanchez that her

19     case was settled in March 2008 for $15,000, and this settlement was paid to the law firm.

20     Sanchez told me that she was not advised of the settlement, nor did she receive any of her

21     settlement funds. Sanchez added that the law firm's responsibility was to use those funds to pay

22     Sanchez's medical bills, to include Dr. Nguyen's bill. Sanchez stated that none of those bills

23     were ever paid by the law firm.

24           48.      In approximately April 2008 (which is shortly after REYES would have received

25     Sanchez's settlement check), Sanchez saw REYES at Sanchez's mother's funeral. Sanchez

26     inquired about the status of her personal injury case and REYES told Sanchez that the case was

27     closing and she was working on it. REYES never told Sanchez that REYES had already received

28     the settlement check.

49.     In June 2012, I conducted a search of the California and the Oklahoma Departments of Corporations database for Lincoln Litigation. The search revealed negative results. A search of the telephone numbers associated with Lincoln Litigation (1-800-228-5016, fax: 1-800-208-4705) also revealed negative results for telephone company carriers. I attempted to call both telephone numbers and both are currently disconnected.

### K.     Other Documents Forged by REYES.

50.     According to Ching, during the course of REYES' employment, and after being terminated, REYES regularly represented herself as Brian Ching. For example, Ching saw several settlement checks endorsed by REYES on behalf of Ching that REYES signed without Ching's knowledge. Ching also saw several unauthorized letters that REYES had drafted and mailed to law firm clients who had complained about their cases. I have reviewed one of these letters.

51.     The November 21, 2010 letter that I reviewed was addressed to Jody Togoonon ("Togoonon") and pertained to law firm client Delos Santos ("Santos"). The letter stated that Ching's son had recently passed away and requested that clients do not file additional complaints with the California State Bar Association during this difficult period. The letter made additional representations about Ching's practice. According to Ching, the signature on the bottom of the letter is not his, and he has never drafted such a notice to his clients.

### L.     Criminal Histories

52.     A review of REYES' RAP sheet indicates that she has no prior convictions. Gloria Custodio has a 1980 misdemeanor conviction for forgery in Alameda County. Ching has a 1984 arrest for carrying a concealed firearm in a vehicle/public place and a 2009 misdemeanor conviction for driving under the influence for which he was sentenced to 90 days in jail.

## IV.    KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING FRAUD CASES AND RECORD RETENTION

53.     From my background and experience, and based upon my conversations with other investigators, I know that individuals regularly maintain records and documents of their business and financial activity, such as receipts for income and expenditures in the form of cash

and checks, ledgers, bank records, bank statements, written agreements and/or contracts, correspondence, notes, and other documents, inside their places of business, storage facilities, vehicles, residences, and other places under their control. The retained documents and records of this kind can be both written and electronic, and are often stored on computer media, including desktops, laptops, and cell phones.

54. From my background and experience I also know that individuals, including persons engaged in illicit activities, including mail fraud, wire fraud, identity theft and/or money laundering, often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time. I have found or talked with multiple federal agents who have found these types of items at such locations in past investigations. Specifically, I consulted with IRS Criminal Investigative Division Special Agent Michelle Eng, who indicated to me that is it common in cases such as this, that subjects retain documents and records for lengthy periods of time, physically and electronically. In addition, based on my experience, in cases such as this, where the subject is lulling his/her victims, it would be important to retain prior correspondence, retention agreements, correspondence, and case-related information in order to continue to delay the victims from reporting the fraud.

55. I am also aware that the proceeds generated from both legal and illegal activities may be spent many years after the activity has stopped. Thus records reflecting income and expenditures for the time period spanning the activity and those years immediately following the end of this activity are essential to any financial investigation.

56. Furthermore, individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc. Records of such instruments are routinely maintained inside their places of business, storage facilities, vehicles, residences, and other places under their control. The retained documents and records of this kind also can be both written and electronic, and are often stored on computer media, including desktops, laptops, and cell phones.

## V.    CONCLUSION

57.    For the reasons stated above, I believe that probable cause exists to search the SUBJECT LOCATIONS above for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C. § 1956 (Money Laundering); and 18 U.S.C. § 1028A (Aggravated Identity Theft), among others, and respectfully request that the Court issue the requested search warrants.

## VI.   REQUEST TO SEAL

58.    Because this investigation is continuing, disclosure of the search warrant, this affidavit, and/or the application and the attachments thereto could jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an order that the search warrant, this affidavit, the application for search warrant, and all attachments thereto be filed under seal until further order of this Court.


_____
NITIANA DOSS
Special Agent, Federal Bureau of Investigation


Sworn to before me this
28th day of June 2012.


_____
HONORABLE KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE

### Attachment A-1

## LCR LEGAL
### 675 Hegenberger Road, #239, Oakland, California  94621



The business premise known as LCR LEGAL is located at 675 Hegenberger Road, #239, Oakland, California.  The building is a three story white colored building with the number "675"marked above the main entrance.  There is a call box to the left of the main entrance and a printed directory taped on the glass window to the left of the main entrance reflecting that LCR LEGAL is located in Suite #239.  Suite #239 is located on the second floor and towards the backside of the building.  The number "239" is visible on the front door of the office with a sign reflecting a business called "ETC."

**Attachment A-2**

**PUBLIC STORAGE, UNIT #A045**
**15951 Hesperian Boulevard, San Lorenzo, California  94580**



The business premise known as PUBLIC STORAGE, UNIT #A045, is located at 15951 Hesperian Boulevard, San Leandro, California.  There is a black colored access gate separating the public parking lot area and the storage units.

## ATTACHMENT B

<u>ITEMS TO BE SEIZED</u>

All records, documents, materials, files, correspondence, and items which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C. § 1956 (Money Laundering); and/or 18 U.S.C. § 1028A (Aggravated Identity Theft), including, but not limited to the following:

1.     Articles of personal property, records, documents, materials, and correspondence tending to establish the identity of persons in control of the premises searched, including but not limited to utility bills and receipts, rent receipts, rental agreements, mail envelopes, identification and/or travel documents and other items which establish personal identification and/or control of the premises searched.

2.     Records, documents, materials, and correspondence containing any reference to/from Lincoln Litigation, Lizzette Reyes ("REYES"), the Law Offices of Brian Ching, Tanya Hatchel, LCR Legal Services, the California Bar Association, to include all correspondence to/from any insurance company, medical provider, and/or medical billing entity, financial institution, and/or bank.  Such records, documents, and materials shall also include all correspondence with any clients of the Law Office of Brian Ching which may contain a bogus, counterfeit, non-authentic, and/or forged signature of Brian Ching or Gloria Custodio, and/or sent on behalf of the Law Office of Brian Ching after June 1, 2011 (the date REYES was terminated at the Law Offices of Brian Ching).

3.     Records, documents, materials, and correspondence with any financial institutions.

4.     Correspondence, memoranda, email, solicitations, private placement memorandums, retention agreements, and/or other communications regarding the fraudulent scheme associated with Lincoln Litigation, REYES, Law Offices of Brian Ching, and LCR Legal Services.

5.     Invoices, statements, receipts, contracts, agreements, financial wire transfer service receipts, credit card receipts, money order receipts, records/receipts reflecting payments made by and on behalf of, or received from clients, customers and business associates, records/receipts reflecting electronic funds transfers between said entities or persons or between

said entities or persons and any customer, and records/receipts tending to reflect payments made by or refunds made to customers and business associates, and/or the expenditure of funds received from customers or business associates.

  6.  Address books, files and records evidencing the identity of customers, clients, and associates; correspondence, facsimile records, correspondence to/from overnight courier services, accounting ledgers and journals; work papers, customer lists, personnel records, pay records, and customer complaints against the company, and other associated companies and individuals.

  7.  Bank, investment, or financial records including check books, bank statements, deposit slips, canceled checks, customer checks, cashier's checks, check books, and other documents regarding the fraud.

  8.  Financial statements, credit reports, records of wire transfers, treasurer's checks and copies of tax returns related to those carrying out the fraud.

  9.  Evidence of purchases, foreign or domestic, including, but not limited to, real estate, vehicles, appliances, electronics, luxury items, or securities. Also, money in any form including but not limited to money orders, traveler's checks and cashier's checks, and cash of more than $200.

  10.  Records of corporations, business trade names, or documents regarding entities used to carry out the fraudulent investment scheme, including, but not limited to Lincoln Litigation, LCR Legal Services, and/or any entity associated with REYES or Tanya Hatchel.

  11.  Records, documents, materials, and correspondence containing any reference to/from the following suspected victim entities or individuals:

      Brian Ching (attorney of the law firm)

      Maria Astorga

      Venissa Bongaling

      Estella Cabato

      Flora Caneja

      Edmund Chui

      Rosann Custodio

      Antonio Custodio

      Julia Custodio

Javier Davalos

Maria Davalos

Bernardino Delos Santos

Elizabeth Delos Santos

Gene Galvez

Simon Ho

Frank Lee

Helen Lee

Christine Nacion

Ramon Navarro

Emeka Ogbu

Maria Perez

Maria Palmenco

Renato "Rene" Salazar

Carmelo Sanchez

Mario Sorto

Marc Tavernier

Jeane Thomas

Sherwin Villegas

Pha Tran Nguyen

Xuan Nguyen

Haydee Nicolas

Kay Galang

Rochelle Richards

Leonila Vismonte

Robert Yonan

Michael Johnson, DC

Linh Nguyen, DC

Phillip C. Reyes, DC

Diana Scott, DC

The term "records," "documents," and "materials," include all of the following items of evidence in whatever form including records, documents, or materials, their drafts, or their modifications that may have been created or stored, including any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph, records, printing, or typing); any electrical, electronic or magnetic form (such as tape recording, cassettes compact discs).

## ATTACHMENT C

### FILTER TEAM PRACTICES AND PROCEDURES

**A.    Filter Team Membership.**

1.    At least one Assistant United States Attorney ("filter AUSA(s)") from the United States Attorney's Office for the Northern District of California who is not part of the case prosecution/investigation team, and will never be so in the future will serve as the filter AUSA(s).  All filter AUSAs will be familiar with the filter team procedures set forth below.

2.    At least one federal agent from the Federal Bureau of Investigation ("FBI") and/or the Internal Revenue Service ("IRS") Criminal Investigative Division ("filter agent(s)") who is not part of the case investigation/prosecution team, and will never be so in the future will serve as the filter agent(s).  The filter agents may include "computer specialists" familiar with Northern District of California Protocol for Searching Devices and/or Media That Store Data Electronically in the event that such items are seized pursuant to consent and/or subsequent search authorization.  All filter agents will be familiar with the filter team procedures set forth below.

3.    The filter AUSA(s) and filter agent(s) are collectively referred to as the "filter team."

**B.    Filter Team Review Procedures.**

1.    During the search of the SUBJECT PREMISES, prior to reading any document in its entirety, a search team agent will conduct a limited review to determine whether the document appears to contain or refer to attorney work product or attorney-client communications with the Law Offices of Brian Ching, or any other attorney ("potentially privileged communications").

2. '    "Potentially privileged communications" includes attorney work product information and confidential client communications.  Potentially privileged communications shall not include: (1) Billing statements, receipts, proofs of payment, money orders, financial instruments, checks, cashier's checks, money drafts, traveler's checks, wire transfers, and/or money orders; (2) Communications with non-client entities such as insurance companies, medical providers, and other non-client third-parties; or (3) Any bogus, counterfeit, non-authentic, and/or forged communications that are so identified by Brian Ching.

3.    If a searching agent encounters any item that may contain potentially privileged communications, the agent will not review the document further and will immediately notify the filter agent to determine whether it appears to contain potentially privileged communications.  Searching agents shall also forward to the filter agent(s) any materials the searching agents are uncertain whether they fall within the scope of the warrant.

4.     If the filter agent determines that a document contains potentially privileged communications, the filter agent will review only the amount of the document necessary to determine whether the document is within the scope of the search warrant. If the document is not within the scope of the search warrant, then it will not be seized, and it will be returned to the place where it was found. If it falls within the scope of the search warrant and may possibly constitute a potentially privileged communication, the filter agent will maintain custody of the document for review by the filter AUSA(s).

5.     The filter agent(s) shall package all potentially privileged communications that are responsive to the search warrant, seal it, mark the envelope as containing "Potential Attorney-Client Privileged Communications" and hand-deliver the material to the United States Attorney's Office for review by the filter AUSA(s) to determine whether the material falls within a privilege. The filter AUSA will also determine if any privileged material falls outside a privilege due to waiver, an exception to the privilege, or the like. In making these determinations, the filter team <u>may</u> confer with Brian Ching regarding the authenticity of such materials.

6.     If any individual or entity asserts a privilege in writing as to potentially privileged communications, then the filter AUSA(s) will review and litigate (if necessary) any issues regarding disclosure of such material.

7.     The filter AUSA(s) shall disclose all non-privileged communications that are responsive to the search warrant to the agents and AUSAs involved in the investigation and prosecution of the case. The filter AUSA(s), with the assistance of the filter agent(s), shall return the "Potential Attorney-Client Privileged Communications" to the legal counsel identified on the material, likely Brian Ching.

8.     The members of the filter team shall not discuss the contents of any privileged communications with any agents or Assistant United States Attorneys involved in the investigation, absent instruction from a filter AUSA.

9.     Computers and other devices and/or media that store data electronically will be searched and seized by computer specialists <u>with the assistance of</u> filter agent(s). The computer specialists shall be instructed that: (1) they may not disclose any information that is stored in or derived from computer equipment or peripherals ("computer information") that is outside the scope of the warrant to anyone; and (2) they may not disclose any computer information that appears to contain a potentially privileged communication that is within the scope of the warrant to anyone other than the filter agent(s) and filter AUSA(s), unless and until ordered by the Court or authorized by the United States Attorney's Office.